Number 1-9-1-5-5-7 Kavita Mehta et al. versus Ocular Therapeutix Inc et al. Good morning, Your Honor. This is Jeremy Lieberman from Pomerantz LLP on behalf of the plaintiffs. I'd like to reserve four minutes for rebuttal. With respect to this case, Your Honor, the Consolidated Men complaint, we think, clearly alleges a class period whereby defendants consistently, and Ocular consistently, failed to follow and adhere to CGMP, current good manufacturing processes, and simply had a process and had a situation where they had no stable, cognizable, consistent way to produce their drug, Dextenza, in any fashion that was fit for commercial use or fit for FDA approval. And those issues were relayed to management, to the individual defendants, earlier on and at the outset of the class period. Beginning in February 2016, they received the first 483 letter, and that 483 letter really highlighted a number of manufacturing and compliance inefficiencies, not just inefficiencies, violations, whereby it was simply impossible for the company to produce this product in a consistent manner. They noted that original data regarding impurities had been discarded, so there was no original data to analyze impurities. They noted that the company was unable to come up with a consistent recipe for Dextenza. If you can't come up with a consistent recipe… Wasn't that notice made public? The notice is…the fact of the notice is made public, but the actual criticisms is most definitely not made public. What they say is, in receipt of a letter that tells them that they had these significant problems, that they were unable to come up with a consistent recipe, that they were unable to analyze the defective lots, all they say is there was the 483 letter raised process controls, analytical testing, and physical security procedures. That's what's relayed in the aftermath of the February 10th letter. What's not disclosed is, and even at that point, what we learn from the second 483 letter is that the company's manufacturing processes were so shoddy that 43% of their lots that they manufactured, nearly half, contained aluminum, which was toxic. And so they had to manufacture processes where they couldn't come up with a consistent recipe, they are producing toxic materials, and even worse, come January 2017, they're actually selling those toxic drugs containing aluminum to the commercial market. And so those are available commercially. Just so I understand the argument, I understood you to be making an argument that there was a false or misleading representation with respect to the manufacturing standard that they were meeting. Yes. And that the evidence of that is in the 483. That's correct. Not that you were making an argument that the description of the 483 itself is a misleading statement. That's correct. You need to show that the statement about the manufacturing process that was made is misleading on the basis of the 483. That's correct. And the CGMP, they're saying that they met the FDA standards for clinical good manufacturing processes. They said they were using them. What's that? They don't say met. What's the phrase? They say they refabricate our devices and drug products using CGMP. The implication is that they're actually conforming to clinical good manufacturing processes, even assuming they're just trying to use them. They're clearly not using good manufacturing processes. Forty-three percent of their lots have aluminum. But at least even if we just got to the scientific issue, the fact that it's phrased as it is, the district court characterized it as aspirational, I guess. Yeah. And then even if we didn't fully agree with that, it is an odd vocation. And then there's the 483. The fact of it is disclosed. So why don't those two things together indicate that the scienter isn't going to be met at the minimum? Because saying you're using clinical good manufacturing processes when actually nearly 50 percent of your lots have aluminum is clearly either a misstatement or is not a statement that's giving complete truth to the situation at Ocular. Well, you don't deny that they made it clear that they received the report and that they had set forth what was in the report. No. They give a very general description of what's in the report. They say they discussed processes, controls, analytical testing. In no way are they saying that they can't even come up with a recipe to produce this product in a consistent basis. That's a critical issue. Well, the 483 isn't a finding that they had that either couldn't, right? We never allege that the 483 is a finding. What the 483 is is we do allege that the observations noted in the 483 were correct. But you just keep saying that it would be misleading to say you're using these standards when you couldn't come up with a recipe. What in the record indicates that they couldn't come up with a recipe? Oh, the fact that 43 percent of their lots contains aluminum and they actually put those to commercial use. Where is that from? Is that from the 483? Yeah, that's the May 483, which says that. But the 483 is not a finding. 483 is just an observation. It's an observation. So the observation is made by the FDA that 43 percent of their lots By an inspector. By an inspector. But the question is whether or not it's a conclusion or an official finding. We allege that those observations are correct. If you look at the KB Pharmaceuticals case, a court can look at a 483 letter, particularly for the basis to say whether or not the observation was accurate or not. There's nothing to say. Defendants don't come up and say, no, the findings in the 483 letter, they don't argue or come to any inference that those observations were inaccurate. There's nothing on the record to contradict whether or not those observations are accurate. Whether or not it was a formal finding is a different matter. The question is, were those observations accurate? There's no allegation otherwise. There's no contrary allegation otherwise that they weren't accurate. Assuming those findings are accurate, those observations are accurate, there's no doubt that the CGMP was not being used. They have toxic chemicals in their products that are being sold for commercial use. And so they may say, well, the FDA looked at procedures. They looked at our testing. That's not giving an accurate sense to investors as to what the critical problems are here. The critical problem was the company couldn't produce this product without having toxic materials. They couldn't come up with a consistent recipe for the product. This is about notice, is it not? It's about giving investors a full and accurate view of the situation. What about the November 9th conference call where he says, we believe. He doesn't give a game. He says, we believe we've addressed, taken the appropriate steps to address the manufacturing-related items raised by the FDA. It's a belief. They say they believe it, but at the same time they know that they're producing 43% of their lots are actually contained aluminum. So I can say I believe. I mean, I have great internal controls, but my controls are completely shoddy. And clearly they knew about these problems. They received the 483 letter. So when you say you believe, and it's actually undercut by actual facts, hard facts, there's no way you can have that belief. I'm still stuck on this point about how we're supposed to think about a case like this when it's a 483, which is not a finding. The question is whether or not, for purposes of pleading, those observations can be. So all you're pleading, did you plead that 40% of their lots? Yes, we pled that. Or did you plead that the 483 found that? We pled that the lots were contained aluminum. The basis for that pleading was the 483 letter. If there was a newspaper article that described the situation at Dick Stenz's plants and described in great detail all the problems with their lots and all the control failures, and I used that for an allegation of a complaint, I can use that. That's permitted under the pleading rules. And there's no finding by a newspaper. It's not a court ruling. And so there's no reason, there's no difference. And the KV Pharma case actually in the 8th Circuit addresses that. To have a per se rule that a 483 letter can never be used as a basis for pleading certainly wouldn't adjure to the federal securities laws. The question is whether or not there's a basis for our, what is it, conclusory pleadings? Clearly it's not conclusory. We have detailed allegations of several manufacturing failures. The company was aware of those failures. It was so bad, 43% of their lots contained aluminum. And the company says, oh, we believe we addressed those issues. You can't say we believe we addressed those issues when they're flowing out, when two months later you're actually putting to commercial use products containing aluminum. And so the impression given to investors that these issues were general in nature, relatively minor, and they were able to somehow correct them, where clearly it was not corrected. The issues regarding strength, identity, uniformity, clearly were not corrected. They were repeated again on May 7th. But you can't say we think we're correcting our problems when you continue to manufacture toxic materials in your. . . In the second 483 letter, didn't they relate to other issues than those which were in the first letter? The issues in the first letter deal with strength, identity, and purity. That was observation 6 in the first 483 letter. Observation number 5 in the second 483 letter had the same exact words. The letter dealt with how you deal with defects and how you analyze defects. That was the first 483 letter. The second 483 letter dealt with discarding batches of materials that contained aluminum. They're not different issues. They're all dealing with defects. They're all dealing with the inability of the company to properly manufacture. . . I don't understand what you're saying. If . . . What's wrong with the district court's construction of the locution as being just a statement about their aspiration to meet those standards rather than a statement that they are currently meeting them? Because if they said we aspire to meet CGMP, perhaps that would be an argument. They didn't say we aspire. They said we use. Particularly . . . They didn't say we use. They said they manufacture them using CGMP. We fabricate . . . They didn't say we are currently and in the past have always used them. They said we fabricate our devices and drug depot products using CGMP. That's their standard that they're using. They don't say we're aspiring to the standard. They say we're using them. It's occurring. Using CGMP . . . Even that would give the impression that somehow they're meeting those standards. And particularly in light of the fact that the company says even months later when they receive the first 483 that we've addressed these issues. We've properly addressed them. We have a fully developed manufacturing process. Those are the words. How can you have a fully developed manufacturing process when 43% of your lots contain, which you're pretty much for commercial use, contain aluminum? That's not fully developed. They say that's what can be tested. What's that? They say what fully developed means is it's the final one that you can now test. That's not what the market understands. The market was looking at whether or not you addressed the 43 issues, and they said in response we have a fully developed marketing . . . Manufacturing facilities are fully developed. Fully developed. You can't say you're fully developed when you can't even get your recipe right. That's not fully developed. That's not what the market said. If they wanted to be so clear and say, well, CGMP is aspirational, they should have said so. If they wanted to say fully developed was some term of art that didn't talk about your actual manufacturing capabilities, they should have said so. The clear impression to the market is there were some relatively basic and minor issues raised by the first 43 letter. They addressed them. They received the second 43 letter, and they say they're now fully developed, and there shouldn't be any major impediment to getting approval. That didn't occur. They weren't even close to being fully developed. They were fully deficient in their processes. Investors didn't understand that and didn't have any basis to understand that. If I could have a few minutes for rebuttal. That's all right. We appreciate it. Thank you. Good morning. Mike Bongiorno from WilmerHale on behalf of the defendants. I just want to clarify something right away. This product was not being commercially sold. Mr. Lieben said that probably six times this morning. Not true. Not in the record. This was a product in development. Ocular did have a product that was being manufactured and sold at the same manufacturing facility with no issues, no 483s, nothing like that. So the statement, we're utilizing or using CGMP when we manufacture our products is exactly that. It's a statement about the standards that govern the manufacturing of products at this company. There were two products being, one being developed. One had been developed, was being manufactured and sold. It wasn't this product. This product wasn't being sold with aluminum in it. You heard that a lot this morning. It's not true. It's not in the record. It's not in the complaint. It's not part of this case. That's not what happened. So what did happen? We made a very general statement in the 10-K on two occasions during the class period, utilizing current good manufacturing practices. That's all we said. What else did we say? Context is important. Can I, on that first point, can I just understand? Suppose the statement was, and I know it's not written this way, but I just want to listen to your argument. Suppose the statement was we have met whatever that standard is. What do you call it? Current good manufacturing practices, CGMP. We have met CGMP in our manufacturing process. Would that have been misleading on this record? Everything else held constant? I don't think so, Your Honor, but I think the bigger hurdle there would be Scienter, if that were the statement. And I'll tell you why. Do you think it's Scienter because the 483 was disclosed? Well, because the 483 was disclosed, because we don't have any motive and we don't have any intent. And certainly the AbbioMed case and others from this circuit say when there's a disclosure, the hurdle for Scienter is much, much higher. So just to go back to answer your question and your hypothetical, I think the bigger problem there would be Scienter, but I know that wasn't your question. Your question was whether or not there would be a misleading statement. And in context, I think not. Also going back to the disclosure, but not on the Scienter point, on the actual false or misleading point, plaintiffs for years battled us over whether or not statements could be read in isolation or whether they needed to be read in context. And when I was a kid doing this stuff, I always said you have to go one at a time, and they always said, no, you have to go in context. So let's take them at their word, because they did win that battle many years ago, and there's lots of cases, digital equipment cases with companies that have come and gone over the years, that say statements need to be read in context. So let's read this one in context. It's in a 70-page 10-K. It's a very simple statement. We manufacture, utilizing, et cetera. We've said it a few times this morning. And in that same document, we got a 483 and some description of what the 483 says. So the plaintiffs really are trying to have their case. And that 483 would indicate that you had some manufacturing problems. And that was disclosed, I assume. Yes, Your Honor. So please. Just to follow on that point, with the description that you gave of the 483, just that description, general description of what the 483 said, in your view, does that description indicate that if the 483 was true, you were not meeting CGMP? Well, it indicates. I don't know the answer to that question, Your Honor. Because that might matter. One thing, if there's things in the 483 that if you had described them, it would be clear you were not meeting CGMP. Well, I think that's the point, okay, of the 483. It's here are our observations. If we can't resolve them, if these are real issues that can't be resolved, then you have a manufacturing problem and you can't get approved. And we said that. We said that in the document. We said we got a 483. They've identified issues. We need to resolve the issues. If we don't, it could lead to us either delay or a lack of approval. That's all in there. So any investor is going to understand that a 483 isn't a joke. It's not a rumor. It's a list of issues that need to be addressed. It's part of a dialogue. It isn't a finding. It isn't set in stone. We all know that this drug eventually did get approved and is being manufactured and sold because the issues were eventually overcome, not as quickly as we would have hoped. But that's not security's fault. But to go back to Judge Stahl's question, which is my point on that is they can't have it both ways. We say there's a 483. They say that 483 means you had violations of CGMP. If that's what it means, then the market knows we got a 483. It doesn't mean that. It depends how you describe the 483 is their argument. I'm sorry. It depends how you describe the 483 is their argument. They say there are things in the 483 that, if known, would signal that to the market, but that the high-level description of the 483 didn't send that signal. I'm not saying they're right, but that's their argument. Okay. So I agree, certainly, that that is their argument. I don't agree that that's correct on its face, but it's also not correct factually here either. Because if we look at what was said, and Mr. Lieberman tries to downplay what was said, what was said was fairly significant. If you look, for example, at the May 2017 483, and this is on page 307 of the appendix, primary focus in the 483 relates to a particulate matter issue as part of our manufacturing process. Now, they'll jump up and down and say, oh, my God, there was aluminum in the product. It's toxic, et cetera. That's what a particulate matter issue is. It's a foreign substance in the product. And aluminum is not this sort of wildly unusual thing to show up. It's in the equipment that is being used to manufacture these things, and, of course, it's all very sensitive and has to be tested, and that's what was happening. What else did we say? Solidifying specifications for in-process, another reference to manufacturing. 100% visual inspection of our inserts, another thing we said in the 483. Enhancing operator training. And then we say, in addition to the particulate matter issue, analytical methods, testing to be completed, quality oversight of batch records. By my count, that's seven things that we said about that 483. So we're getting beaten up for disclosing a 483 where the stock price reacted negatively to the disclosure. In Genzyme, which obviously was this court, the company waited months and months and months before disclosing the 483. Judge O'Toole dismissed that case. This court affirmed it. Genzyme had steel in their product, not dissimilar to aluminum. Genzyme ended up getting fined by the FDA, getting sued by the FDA, et cetera. Warning letters, all those things. None of that happened here. 243 letters, working with the FDA. What was the representation in Genzyme? I'm sorry, Your Honor? What was the representation in Genzyme? Well, Genzyme was an omissions case. Yeah, but that's the point. This is not an omissions case. The claim is that the representation is misleading in light of the content of the 483 on a pleading standard. So I think you have to address that aspect of it where it says using, because Genzyme doesn't help you with that point. Oh, no. Genzyme does, Your Honor. Well, it's not specifically addressed in the First Circuit. The record is very clear. In the complaint, we went back and read the briefs and read the complaint at the district court level, and there is a representation regarding compliance with the law and with the FDA rules and regulations. So it's not as though that allegation wasn't made in that case, but I think what the court is also referring to isn't just, correct me if I'm mistaken, not just the CMGP representation but the fact that we chose to disclose and what did we disclose and I think here, so I don't think there is that distinction that the court was referring to. I thought you said Genzyme was an omissions case. It is an omissions case, Your Honor, because what they say is in light of the receipt of the 483, you disclose nothing. So in that sense, it is most certainly an omissions case. Here it's we're getting beat up for actually disclosing the 483 but not disclosing enough. No, you're getting beat up for saying you're using CGMP when you had in hand a 483 that made it crystal clear you were not. That's their allegation. And all you disclosed was a description of the 483 that did not make it crystal clear that you were not. That's the argument. Yeah, well, I think we're saying the same thing, Your Honor. We make a representation in regard to CMGP. We get a 483 and we disclose it. I'm sorry, but we don't disclose enough of it. And I think, you know, I went through what we did disclose in the 483 and the specificity. We disclosed it, and I think that is more than enough. And I think it's a pretty tough line to try to draw to say, you know, in Genzyme you got a 483. You didn't disclose it here. You got a 483. You did, but you didn't. And the stock went down. It was viewed as negative. You gave a lot of description about it, but it just wasn't good enough. Therefore, you're liable for securities fraud. I think that's a very tough case to make on false and misleading statement, on omission. But I'll go back to it again. In particular, on Sienta, I think it's very, very tough when a company gets a negative letter from the FDA and no one's arguing it's not a negative letter and responds to it and discloses it and the stock price reacts negatively to say they acted with Sienta, that there was some sort of real intent to deceive. And if you go back to, you know, some of the case law here, conscious attempt to defraud is what this court said in AvioMed. And it noted that in the face of disclosures, it said the actual disclosures undercut the inference of Sienta. I think it's severely undercut here because of the fact that the disclosures were made. There were negative disclosures. The stock price went down. And there were no stock sales. There were stock purchases during the class period. A very, very unusual case. These are oral representations at a meeting, correct? Some are, some are not. Most of the ones which are raised here occurred when there was a question and answer period. That's right. Is that correct? That's right, during an analyst conference call. So in those conference calls, as I understand it, an analyst can say, well, you just said so-and-so. What about this? Is that the way those calls? That's the way they typically go, and that's the way this one went, yes. So they don't point to anything here, at least as far as I can tell, where they say there was a misrepresentation, a direct misrepresentation. Rather, they say it didn't say enough. That's right. And so someone listening in on one of those calls obviously had the ability to say, well, tell me a little bit more about that 403. That's right, Your Honor. And in particular, these analysts are very savvy. They follow the biotech industry. They understand what a 483 is. They understand the implications of it. They ask questions about it, and they are extemporaneously trying to answer those questions. And my view is they certainly did the best they could with it. And no indication of an intent to deceive. You can imagine they would have to have developed some conspiracy to decide what to say and not say off the cuff during a call in the 24 hours between getting a 483 and having this conference call. And that is not the more plausible inference here. In fact, rather than saying we have met the CGMP, it says using the CGMP, which the district court took to mean it was just a representation of the standard that they aspired to meet, not necessarily a representation that in every instance it had been complied with perfectly. Is that your position? Yes. Yeah. So do you have any authority that would help support that construction of it rather than considering it to be a representation that they were saying that we had been in perfect compliance with the CGMP? So, you know, I would cite the cases like there's a J.P. Morgan case in the Second Circuit. I can give you the citation. 553 F. 3rd, 187. That's from about 10 years ago. And then much more recently this past year, Cigna. If I can read my writing, 918 F. 3rd, 57. That's a 2019 Second Circuit case. And those are cases that basically say those types of statements are not guarantees. They're not warranties. And I think Judge O'Toole got it exactly right here in the description and the analogy to, you know, we prepare our financial statements in accordance with GAAP. That doesn't mean we've never in our life had a GAAP violation and we never will again. And I think here it's a little bit better because in the very same document you have the 483 being disclosed. And could you just do the same analysis with respect to the fully developed, which they also raised? Why is that not a statement that is going to be heard as a statement that we are now fully compliant with CGMP? Sure. So a lot of things on fully developed. The first is, as I think Judge Stahl mentioned when Mr. Liebman was speaking, I think, I believe, I think it is a strong sign that. There's one version of it where they don't have that qualifier for fully developed, I thought. I thought it was a straight out representation. Not exactly. I think what they say is that the statement is, I believe that our fully developed manufacturing process, et cetera. And they say you can parse it to say that that adverb-adjective combo, it doesn't relate back to the I believe at the beginning or whatever. I think that is slicing it way too thin. So I think they are statements of opinion. And furthermore, again, the context matters. So we're talking about fully developed. Obviously, there's FDA statements where fully developed means it's at a point where it can be tested. Obviously, this was at a point where it could be tested. That's what the FDA was doing. And furthermore, it is in the same discussion, the same annals conference call we were just talking about, where we're talking about a 483 and observations that were made in the 483. So in that context, not reasonable to think that that means we're done. There's nothing to improve. There's nothing to work on. Thank you. Thank you, Counselor. So just to address the issue regarding fully developed, the statement is, first of all, it's used twice in the May 5th conference call, purposely by two different people. And so first, Defendant Sawney says, They don't say we believe we have a fully manufactured process. They say it is a fully developed manufactured process. Then Defendant Anchor, in the same conference call, says, They are saying their manufacturing process is fully developed. Two different people are saying it is. And they do coordinate what they tell the market. These are sophisticated corporations. We're talking to investors. Both of them are purposely They cite FDA material that makes that a term of art, fully developed. But I don't think that's a term of art. FDA material is not, we don't think it's subject to judicial notice. We don't think that's something that analysts are looking at. When people hear our manufacturing process is fully developed, they believe that the manufacturing process is indeed fully developed. Just what those words mean. So to think that the investors might think, oh, it means some type of arcane definition in an FDA book, that's not reality. Particularly on a motion to dismiss, where we're dealing with whether or not there's a material misstatement, that's a question of fact. And the Boston Scientific How would you get past Scienter on that, if it is an FDA term of art? Because it's a question of fact whether it is an FDA term of art. And simply the reasonable reading of the statement is that the manufacturing process is fully developed, which means without material error, without major error, here we're saying it's not fully developed. Forty-three percent of your lots are being produced with aluminum. And that's never being sold to the market. There's no statement regarding the 43 letters that would give any indication as to how severely flawed their manufacturing process was. So in your mind, fully developed means fully perfected? Oh, no, not perfect. Not flawlessly developed. It means competently developed, at least. How about that? I think that's a fair reading. Competently developed. But we don't have competently developed. We have 50 percent of the batches have aluminum. And they said it wasn't sold for commercial use. We just note that the May 2017 letter says that lots with 224 plugs rejected due to unknown particular matter were released for intended commercial use on January 12, 2017. It's straight out in observation number one of the May 43 letter. So you're right. It doesn't mean perfectly developed. And we agree with that. We'll stipulate to that. It certainly means competently developed. It certainly means not so poorly developed that you can't even get the recipe right. And it doesn't mean that it's so poorly developed that you can't make it without putting in toxic materials. And that's the question. And no investor would be apprised or understand it to mean anything else other than it's developed in a way that it can be reasonably manufactured in a safe manner. And that's clearly not what's occurring here. I think the district court, when they analogize this to a GAP situation, we think it's actually apt. If someone says we're complying with GAP, that is a critical statement. So the question is, are you actually generally complying with GAP? Are there major violations of GAP occurring? And we state here in this situation there are major violations of CGMP. And so the GAP is an excellent example. Here there are major violations. The company can't get its recipe right. The company is putting dangerous materials in its products. And the company continually is describing critical data regarding defects. And so that GAP analogy is actually perfect here. We think the court should adopt it. And so, again, we go back to the statement using CGMP. It certainly doesn't speak about an aspirational tone. It means the way we're producing this is using CGMP. It complies with CGMP. That's the only credible reading. So really defendants are asking that the words using CGMP don't mean that. They're aspirational. The words fully developed manufacturing facilities don't mean fully developed. They mean something else. So what defendants are really asking is, take all of our statements that are made to the market, these critical statements, and believe that they mean something else or something much more arcane. And we don't think that's what we can do on a motion to dismiss. We don't think this court's progress allows for it. And we do think the order should be reversed. Thank you.